IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2010

## STATE OF TENNESSEE v. LARRY WARD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-02572    James C. Beasley, Jr., Judge**

---

**No. W2009-01876-CCA-R3-CD  - Filed April 7, 2011**

---

The defendant, Larry Ward, stands convicted of criminally negligent homicide, a Class E felony.  The trial court sentenced him as a Range II, multiple offender to four years in the workhouse.  On appeal, the defendant challenges the sufficiency of the evidence to sustain his conviction.  Upon our close review of the evidence, we are constrained to conclude that the evidence was insufficient to prove beyond a reasonable doubt that a homicide was committed in this case.  Therefore, we reverse the judgment of the trial court, vacate the conviction, and dismiss the charge against the defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed
and Dismissed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Neil Umsted (on appeal) and Stephen Sauer (at trial), Memphis, Tennessee, for the appellant, Larry Ward.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Pam Fleming and Patience Branham, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

#### Background

On April 2, 2007, a Shelby County grand jury indicted the defendant for the premeditated murder of his wife, Gloria Ward.  The parties tried the case before a jury in May 2009 and presented the following evidence.

*State's Proof.* Diann Fryer testified that she was the victim's sister. She and the victim spoke by phone every week. Mrs. Fryer testified that the victim and her husband, the defendant, managed properties together. She described the victim as self-confident and having an upbeat personality. Mrs. Fryer learned that the victim died when their sister, Barbara, called her on July 8, 2005. She said that she was "not surprised because there had been so many incidences of her being in abusive situations with her husband." In January 2005, the victim had called her to tell her that she found a "cryptic note . . . on her nightstand that [the defendant] had written about all people are going to die." Mrs. Fryer testified that she advised the victim to call the police and to leave the house. The victim went to a shelter, but she returned home after the defendant told her that he would get medication and go to therapy. Mrs. Fryer said that the victim had left the defendant "many times." She testified that the victim had cardiac problems and had a heart valve replaced. The victim was also seeing a counselor because of her marital problems. Mrs. Fryer said that the victim would not have worn the patched blue jeans found in her home after her death because the victim "liked nice clothes . . . [and] if she wore blue jeans, they were pressed and ironed." Mrs. Fryer testified that the victim wrote with her left hand. To her knowledge, the victim did not use her right hand for any purpose.

On cross-examination, Mrs. Fryer said that the victim had a prosthetic left eye because of glaucoma. Mrs. Fryer said that the victim's doctor had told the victim that she was having hallucinations about the defendant hurting her and that she suffered from paranoia. She was unaware that the victim and the defendant had divorced and remarried. Mrs. Fryer admitted that she did not know that the victim had surgery on her right hand for carpal tunnel syndrome and that she reported to her physician that she used her right hand for everything except writing.

James Fryer, Mrs. Fryer's husband, testified that he knew the victim through his wife. He said that in January 2005, the victim was living in a homeless shelter, and he offered to have her live with him and his wife in Knoxville. She did not accept his offer.

On cross-examination, Mr. Fryer stated that the victim told him that she loved the defendant and wanted to stay with him.

Barbara Tharpe testified that she was the victim's sister. She talked to the victim approximately once a week, but the victim had distanced herself from her family. Mrs. Tharpe said that the victim invited her and her husband to come to her house for Thanksgiving in 2004. She said that it was the first time the victim had invited them to come to her house. They arrived at 11:00 a.m. and stayed until 4:30 or 5:00 p.m. The victim had prepared a large meal and "was very proud of herself." Mrs. Tharpe said that the victim kept

her conversation to a minimum because she was very reserved around the defendant. She was more outgoing when he was not there. Mrs. Tharpe said that the victim never appeared suicidal. She testified that she went to the victim's house before her funeral to obtain burial clothes, and she was unable to locate the victim's purse or cell phone.

On cross-examination, Mrs. Tharpe said that she knew the victim had been in counseling because the victim suspected the defendant had an affair.

Eddie Heaston testified that he was a supervisor for the 911 center. He authenticated a recording of a 911 call received on July 8, 2005, from 2389 Faxon Avenue. The state played the tape for the jury.

Memphis Police Officer Robin Bass testified that he worked uniform patrol in the area around Faxon Avenue in July 2005. He said that dispatch sent him to 2389 Faxon Avenue with information that there had been a suicide. Officer Bass said that he was familiar with the address because he went to that address in January 2005 when a female called needing assistance. He recalled that when he arrived at the house in January, a female ran to his car and was visibly shaken. She told him she was scared of her husband because he had beaten her in the past. When she got into the car, she hid in the backseat because the defendant was driving down the street. Officer Bass took her to a shelter for abused women. He said that he collected a note from the victim, which she said her husband had written. The note read, "The anticipation of death is worse than death itself. Be ready." In July 2005, when Officer Bass responded to the suicide call, the defendant met him outside and informed him that his wife had shot herself. He said that the defendant had a calm demeanor and told him that when he returned home from the store, he found the victim inside the house. Officer Bass entered the house and observed the victim lying on the floor. He secured the area around her and waited for paramedics to arrive. When homicide detectives arrived, he relinquished the scene to them. He said that he was present when the detectives found a weapon under the victim's buttocks, "underneath the top layer of clothing but on top of the bottom part of the shirt."

Memphis Police Officer Nicholas Kollias testified that dispatch sent him to Faxon Avenue in July 2005 for a reported suicide. Officer Bass and the defendant were present when he arrived. He testified that he did a protective sweep of the house, looking for weapons, and he did not immediately notice the weapon underneath the victim. After a few minutes, he saw the handle of a gun sticking out from under the victim's right leg. Officer Kollias testified that in cases of self-inflicted gunshot wounds, the weapon would generally be located by the victim's hand or head rather than under a leg. He opined that the victim in this case might have fallen on the weapon. Officer Kollias said that the position of the victim, "laying in the doorway," seemed strange to him.

On cross-examination, Officer Kollias testified that he had encountered five to seven suicides in the two and a half years he had been on the police force prior to July 2005. On re-direct examination, Officer Kollias said that the victim was the first reported suicide of a black female that he had encountered.

Nikki McIntosh testified that she was the director of the abused women's shelter for the YWCA of Greater Memphis. She said that the shelter was a temporary shelter for women and children fleeing domestic abuse. Ms. McIntosh testified that the victim entered the shelter on January 28, 2005, and left on February 2, 2005.

James Coburn testified that he was a fire fighter paramedic with the Memphis Fire Department. On July 8, 2005, dispatch sent him to the scene of a shooting on Faxon Avenue. When he arrived, he observed the victim lying on the floor. Mr. Coburn testified that she appeared deceased because she was not moving or breathing and that he observed brain matter and skull fragments on the floor. He confirmed death by attaching a cardiac monitor to the victim. He attached the monitor's electrodes to the victim but did not move her body. Mr. Coburn testified that he had responded to five to six suicides prior to July 2005, and none of the prior suicides were black females.

Donald C. Parker, a fire fighter and EMT with the Memphis Fire Department, testified that he went with Mr. Coburn to Faxon Avenue on July 8, 2005. He said that he had responded to between ten and twenty suicides during his career, and the victim was the first reported suicide of a black female he had encountered.

Memphis Police Officer Charles Cathey, with the crime scene unit, testified that he processed the scene at Faxon Avenue on July 8, 2005. Officer Hope Smith also processed the scene. Officer Cathey photographed the scene and collected a .22 caliber silver revolver with a black handle from under the victim's right leg. He unloaded the gun and found the spent cartridge in the cylinder. Officer Cathey testified that he placed a biohazard sticker on the weapon because he observed some substance on the weapon, but he could not recall what the substance looked like. He also photographed what appeared to be spots of blood on the inside of the back door. He testified that, from the ten to eleven adult suicides to which he responded, the victim in this case was the only black female.

On cross-examination, Officer Cathey testified that he was present when the body removal team removed the victim. He said that the victim's gown was on her body when they took her to the morgue. Officer Cathey stated that hair fibers were on the weapon and the back door.

Memphis Police Lieutenant Jessica Burton testified that she was the lead investigator in this case. Lieutenant Burton said that she had investigated approximately twenty suicides and had never encountered a black female suicide victim before this case. She testified that she felt the homicide charge against the defendant was appropriate because (1) she had not seen a black female suicide before; (2) the body was lying near the back door; (3) the victim was still wearing her eyeglasses; and (4) the gun was between the victim's legs. She stated that she understood that the victim was left-handed. Lieutenant Burton said that she subpoenaed the defendant's cell phone records but never saw them.

On cross-examination, Lieutenant Burton testified that she scrolled through the defendant's cell phone on the day that she took him into custody and verified the calls that he told her that he had made on July 8. Lieutenant Burton said that she did not follow up on the cell phone records because she transferred to another bureau. She testified that the victim's left-handedness was a factor in the decision to charge homicide.

Memphis Police Officer Hope Smith, a crime scene officer, testified that she collected evidence at 2389 Faxon Avenue on July 8, 2005. She said that she concentrated on a bathroom and bedroom. In the bedroom, she photographed a purse and a pair of blue jeans. She collected the blue jeans as evidence because of a dark stain on one of the legs. Officer Smith testified that she collected two washcloths from the hallway between the bedroom and bathroom. She collected another washcloth, a cleaning rag, a t-shirt rag, a scrub puff, and an ashtray from the bathroom. Officer Smith also collected samples of substances from the sink, the ashtray, the floor, and the faucet.

On cross-examination, Officer Smith said that she was unable to tell whether the blue jeans belonged to the defendant or the victim.

Memphis Police Sergeant Anthony Mullins testified that he participated in the investigation of the victim's death by interviewing the defendant. He said that he advised the defendant of his *Miranda* rights, and the defendant agreed to speak with him. The defendant told Sergeant Mullins that he woke up at 5:00 a.m., and he and the victim drank coffee and watched television. He left the house because he was going to do roofing work for Ursula Jones. He called the victim on his way to pick up supplies. The defendant said that he visited a friend, Ms. Glover, and called his wife again at 7:45 a.m. When the victim did not answer either her house or cell phone, the defendant rushed home to check on her. The defendant said that the doors were locked, and when he went in through the back door, he saw her lying on the floor. She did not respond when he called her name, and he noticed that her eyes were open but there was blood on the floor and on the right side of her head. He did not touch or move anything, and he called 911 at 7:48 a.m. The defendant verified the times that he called with his cell phone. The defendant told the 911 operator that the

victim shot herself, but the defendant told Sergeant Mullins that he did not see a gun. The defendant said that he had a 20 gauge shotgun, a .22 caliber rifle, and a .22 magnum revolver in his house. He told Sergeant Mullins that the revolver was the victim's gun. He said that she kept it in the bedroom, but he did not know exactly where in the bedroom. He said that the victim appeared normal that morning and was not depressed or talking about suicide. Sergeant Mullins said that when they took a break from the interview, he learned that the victim had bruises on her face and torso. He asked the defendant about the history of domestic abuse, and the defendant said that he and the victim "had gotten into a physical fight on the previous Wednesday and that each of them put their hands on the other one." The defendant said that the victim confronted him about having an affair, and she attacked him. Sergeant Mullins said that he did not observe any injuries on the defendant. Regarding the note that led to the victim's call to police in January 2005, the defendant said that it was a quote from a movie that he had written down. The defendant recalled that the victim had called the police and asked them to take her to a shelter because she was afraid. Sergeant Mullins asked the defendant which hand the victim normally used, and he said that she wrote with her left hand but predominately used her right hand for other things. Sergeant Mullins asked the defendant for his consent to search his house for additional evidence, and the defendant gave his consent with the condition that his friend, Ms. Glover, be present. The defendant told Sergeant Mullins that "[a]fter [the victim] got on that medication, she had been different." He said that losing her eye to glaucoma was a "big blow" to the victim, and she had problems with allergies and asthma. He further said that she became depressed after her heart surgery, and "[t]hen she started talking about [the defendant] didn't want her anymore[.]"

On cross-examination, Sergeant Mullins testified that the defendant also told him that when he first saw the victim, he thought that she had passed out. The defendant told him that the victim had said, "I'd be better off dead," and "[I]f I was dead[,] I wouldn't have to worry about this." Sergeant Mullins said that the defendant did not attribute those statements to suicidal thoughts.

On re-direct examination, Sergeant Mullins said that he directed crime scene officers to collect items from the bathroom because he felt there was a "very distinct possibility" that someone had cleaned himself or herself off in that room based on drippings that appeared to be blood.

On recross-examination, Sergeant Mullins testified that he did not find a trail of blood from the body to the bathroom where he had the crime scene officers collect evidence. He agreed that there was no way to determine the age of the blood found in the bathroom.

Tennessee Bureau of Investigation Agent Margaret Bash testified that she was a serologist and DNA analyst in July 2005. She testified that her testing revealed the presumptive presence of blood on the following items taken from the bathroom at 2389 Faxon Avenue: a body scrubber, a cream colored washcloth, a sample from the bathtub handle, a sample from the bathroom floor, and a sample from an ashtray. Agent Bash said that she did not conduct further testing to confirm that the substance found on the bathroom items was blood because the testing would have consumed all of the samples with nothing left for DNA testing. She testified that she compared the DNA profile developed from the body scrubber, the floor, the washcloth, and the ashtray with the victim's DNA and the defendant's DNA and concluded that it matched the victim. She testified that the blood on the bathtub handle did not contain sufficient DNA or the DNA was too degraded to make a comparison.

On cross-examination, Agent Bash confirmed that she did not know the age of the blood stains.

Tennessee Bureau of Investigation Agent Steve Scott, a firearms identification expert, testified that the bullet retrieved from the victim was fired from the Taurus .22 magnum pistol found at 2389 Faxon Avenue.

Tennessee Bureau of Investigation Agent Laura Hodge testified that she conducts gunshot residue and fire debris analyses at the Nashville Crime Laboratory. Agent Hodge testified that Agent Russ Davis tested jeans, a t-shirt, and shorts from 2389 Faxon Avenue for gunshot primer residue. His analysis did not reveal gunshot primer residue on the clothing. Agent Hodge testified that she analyzed the gunshot residue kit taken from the victim's hands. She said that the results were inconclusive and could not eliminate the possibility that the victim "fired, handled, or was near a gun when it fired." Agent Hodge explained that some .22 caliber ammunition did not contain the elements necessary for gunshot residue analysis.

On cross-examination, Agent Hodge testified that low levels of barium and lead were present on the victim's hands. She explained that antimony must also be present for her to confirm the presence of gunshot residue.

Dr. Kenneth S. Snell testified that in July 2005, he was the Deputy Chief Medical Examiner for Shelby County. He testified that he examined the victim and determined that she died of a contact gunshot wound to the right side of her head. He recovered a small caliber projectile from the wound. Dr. Snell said that the shape of the wound indicated that the weapon was pressed into her skin. He testified that she had multiple contusions on her face, arms, and legs that he estimated to have occurred less than forty-eight hours prior to her

-7-

death. Dr. Snell testified that he classified the victim's death as a homicide based on his discussions with investigating officers. He said that he is familiar with studies on weapon positions following suicides, and he testified that in the majority of cases, when a suicide victim shot himself or herself from a standing position and was found lying flat, the weapon was in contact with the body. He was unaware of a case where the weapon was underneath the body.

On cross-examination, Dr. Snell testified that he did not notice that the victim's left eye was a prosthesis. Dr. Snell said that investigating officers did not tell him that the victim took any mental health medications. He testified that he did not retain the victim's nightgown as evidence because investigating officers were not interested in it.

Tennessee Bureau of Investigations Agent Donna Nelson, a forensic scientist, testified that she examined blue jeans recovered from 2389 Faxon Avenue and determined, through DNA analysis, that the blood on the jeans was the victim's. She also examined a t-shirt from the scene, but she did not discover any blood on the shirt and was unable to obtain a DNA profile from it.

On cross-examination, Agent Nelson testified that she did not make any determination regarding the age of the bloodstains on the jeans.

*Defense Proof.* Willie C. Glover testified that she had known the defendant for twenty-seven years, and she knew the victim through him. She was a friend of them both. Ms. Glover said that the defendant moved into a spare bedroom at her house in September 2006. Ms. Glover recalled that on July 8, 2005, the defendant called her at either 6:30 or 6:35 a.m. He went to her house at approximately 7:15 a.m. and stayed for twenty to thirty minutes. She said that he measured the tires on a truck that he had parked in her backyard. Ms. Glover testified that after the defendant left her house, he called her at 7:48 a.m. She went to his house and learned that the victim had been shot. She recalled that the defendant was wearing a blue t-shirt and green shorts that day. She said that he acted normally when he went to her house that morning.

On cross-examination, Ms. Glover read the statement that she gave to the police on July 8, 2005, in which she stated that the defendant went to her house at 7:15 a.m. and called her at 7:30 a.m.

Ursula Jones testified that the defendant was a family friend and that she had known him since the 1970s. She called him on July 7, 2005, to ask him to work on her roof. They agreed to meet the morning of July 8 so that she could give him money to purchase supplies. He called her at 6:40 a.m. on July 8 and told her that he was in her driveway. She got dressed

and met him outside at approximately 7:00 a.m. They discussed what work needed to be done, and then they went their separate ways. She recalled that he was wearing a light blue t-shirt.

Dr. Joseph Hudson testified that he was a retired neurosurgeon and previously worked at Semmes Murphy Clinic. He testified that he performed carpal tunnel surgery on the victim's right hand in 1998. The victim reported on the clinic's intake form that she wrote with her left hand and used both hands equally.

Marybeth Wingfield testified that she was a licensed clinical social worker. She testified that the victim came to her for therapy on April 23, 2004. The victim reported that she was divorced after twenty years of marriage and that her ex-husband had an affair in 2000. Ms. Wingfield's notes from the therapy session stated that the victim experienced depressed mood, sleep disturbance, decreased appetite, anhedonia, increased anxiety, decreased memory, social isolation, and paranoid ideation. The victim reported that she had visual hallucinations. Ms. Wingfield testified that the victim and the defendant came to her office together on May 14, 2004, and reported that they were considering reconciliation but were concerned about each other's infidelity. The victim told her that she was taking Zyprexa and no longer experienced hallucinations. The victim asked Ms. Wingfield to write a letter on her behalf to her rental agent explaining that "she was stressed and not making good . . . rational decisions." On May 20, 2004, the victim stated that the defendant could not forgive her for her infidelity. She told Ms. Wingfield that the defendant was bipolar, for which he was on medication, and that she was fearful of violence. She said that the defendant was verbally abusive when upset, that he attended Alcoholics Anonymous meetings, and that he had been in jail for physically abusing a girlfriend. Ms. Wingfield said that her transcribed notes stated that the defendant had suicidal ideation; however, she testified that her handwritten, contemporaneous notes from the May 20 session stated "some suicidal ideation, no plan" with no reference to whether the notes referred to the victim or the defendant. Ms. Wingfield said that "there [was] a real possibility that [the notes referred to the victim's] suicidal ideation" rather than the defendant's. On July 20, 2004, the victim reported that she and the defendant were married and "doing well."

Dr. Joan Michelle Allmon testified that her records indicated that Dr. George Chu prescribed Zyprexa for the victim, and the victim contacted Dr. Allmon to refill her prescription. Dr. Allmon testified that she agreed to refill the prescription if the victim would see a psychiatrist. She referred the victim to Dr. Robert Burkhalter.

On cross-examination, Dr. Allmon testified that she diagnosed the victim with a sexually transmitted disease in March 2005.

Dr. Robert Burkhalter, a psychiatrist, testified that he first saw the victim on May 20, 2005. She complained of depression and having paranoid thinking. She reported that she was on Zyprexa but at one point stopped taking it. She said that when she stopped taking Zyprexa, she became paranoid and had hallucinations. Dr. Burkhalter testified that someone had previously diagnosed the victim with post-traumatic stress disorder related to her marital problems, and she reported that she "was caught in another man's apartment" a year before she saw Dr. Burkhalter. Dr. Burkhalter said that he diagnosed the victim with major depression with psychosis and changed her medication to Abilify. He testified that she had no risk of suicidal or homicidal ideation. Dr. Burkhalter said that the victim experienced nausea as a side effect of Abilify, so he reduced her dosage by half. He saw her again on June 23, 2005, and in his opinion, "she was definitely better."

On cross-examination, Dr. Burkhalter testified that suicide was a possible side effect of Abilify but said that "[i]t's not something that we [usually] consider to be a side effect or we worry about as a side effect of Abilify."

Dr. O'Brian Cleary Smith testified as an expert in forensic pathology and blood spatter. He testified that the examination of the victim's nightgown that she was wearing when she died would have been important in the determination of whether she died by suicide or homicide because an examination would reveal the location of powder burns and bloodstains, which he said are crucial to understanding the orientation of the weapon. Dr. Smith said that examination of the victim's hands would have revealed the distribution of gunshot residue and blood spatter, which would have given the medical examiner evidence as to whether the victim's death was suicide or homicide. He testified that examination of the paths from the victim's body to the bathroom where police found her blood might have revealed whether someone walked from her body to the bathroom after killing her. Dr. Smith said that forensic examination of the victim's head should have included her eyes and that her prosthetic eye would have been obvious. Dr. Smith testified that as a medical examiner, he took tissue samples to determine the age of injuries rather than relying on the color of bruising, as Dr. Snell did, because it was a more accurate method. He testified that a 2000 study from Emory University stated that "African American women who report high levels of psychological stress, hopelessness, drug use, and relationship discord, should be [assessed] carefully for suicidal ideation." Dr. Smith said that mental health care providers look for psychological risk factors, such as "psychological distress, post-traumatic stress disorder symptoms, haplessness, drug abuse, . . . physical partner abuse, non-physical partner abuse, . . . childhood maltreatment[,] and . . . low levels of social support . . . rather than just dealing with the demographics." Dr. Smith said that he was unable to opine what the manner of death was in this case because "[t]hings [were] missing that [were] needful to be able to make a determination." He testified that he did not "have enough pieces of the puzzle" and would not "feel comfortable" ruling the case a homicide.

-10-

Following the close of proof and deliberations, the jury convicted the defendant of the lesser-included offense of criminally negligent homicide. The trial court sentenced him as a Range II, multiple offender to four years in the workhouse.

**Analysis**

On appeal, the defendant argues that the evidence was insufficient to sustain his conviction for criminally negligent homicide. Specifically, the defendant claims that there was no evidence that he engaged in criminally negligent conduct that caused the victim's death.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Genaro Dorantes*, No. M2007-01918-SC-R11-CD, 2011 WL 208306, at *12 (Tenn. 2011) (adopting the United

States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death." Tenn. Code Ann. § 39-13-212(a). A person commits criminally negligent homicide when his conduct or the result of that conduct causes the death of another person, and by his conduct it is evident that he failed to perceive a substantial and unjustifiable risk that a result would occur (namely, death). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code. Ann. §§ 39-11-106(a)(4); -302(d).

The proof in this case shows that the victim died as a result of a close contact gunshot wound to the head. However, the evidence presented does not establish that the victim died as a result of a homicide. The state has simply failed to put forth sufficient evidence that any rational trier of fact could have found the essential elements of criminally negligent homicide beyond a reasonable doubt. The evidence in this case is inconclusive. Moreover, even assuming, that the evidence before us was sufficient to prove homicide rather than suicide, the evidence is not sufficient to establish the defendant as being the person responsible for the victim's death. Thus, we must conclude that the evidence was insufficient to convict the defendant of criminally negligent homicide. Therefore, we reverse the judgment of the trial court, vacate the conviction, and dismiss the charge against the defendant.

## Conclusion

Based on the foregoing reasons, we reverse the judgment of the trial court, vacate the conviction, and dismiss the charge against the defendant.

_____
J.C. McLIN, JUDGE